I believe the clock will come back. And I'll give you a five-minute warning, Mr. Renner. Thank you, Judge Owens. Yes, just holding up five fingers will be sufficient. Very well. Okay, why don't you proceed then, Mr. Renner? Thank you very much, and may it please the court. The principal issue on appeal is whether PLS adequately alleged that the clear cooperation policy was anti-competitive, and that the clear cooperation policy caused PLS an antitrust injury. The district court erred by finding to the contrary. Clear cooperation as a policy leverages the market power of the multiple listing service to force real estate brokers to submit listings to the multiple listing service that those brokers would have otherwise preferred to submit to alternative listing networks. PLS was competing for the patronage of those real estate brokers by offering lower prices and an innovative bundle of services. And that competition was competition on the merits that the antitrust laws protect. Clear cooperation by discouraging real estate brokers from submitting listings to the PLS instead of the MLS predictably harms competition and cause PLS an antitrust injury. Clear cooperation harmed in a single stroke PLS, competition in the listing network services market, and real estate brokers. Before you go further with the merits, as you recall, we ask you to be able to address the jurisdictional issue that we raised. Specifically, we ask you to be prepared to discuss our jurisdiction over the issues in subsections two and three of the district court's order because your notice of appeal designates only subsection one. Do we have jurisdiction over the issues raised in subsections two and three? Your Honor, thank you for that. Our view is that subsections two and three of ECF 97, which is what we're appealing from, were non-dispositive motions that were denied as moot. And so we're not appealing subsections two and three. We're appealing subsection one. Subsection one, a reversal of the district court's order on subsection one would grant us all the relief that we seek on this appeal. Subsection one granted the motions to dismiss, dismiss the complaint with prejudice and denied leave to amend. That's what we're appealing. Okay, is it also your contention that to the degree anything that was covered in subsection two and three might be relevant? It is covered by you and your pleadings and responded to by the appellee? Subsection two, if I recall, Your Honor, related to the anti-SLAPP motion filed by CRMLS. The anti-SLAPP motion does involve a discussion of the merits of the antitrust claim, but includes analytically distinct and idiosyncratic elements that arise under California state law. So to the extent the antitrust issues that are subject to the appeal of subsection one overlap, there may be a degree of overlap, but all the relief we seek would be granted by reversal and remand of subsection one. Okay, thank you. Thank you, Your Honor. So how does clear cooperation harm competition? Clear cooperation harms PLS because it deprives PLS of the critical mass of listings necessary to expand and grow into a threatening competitor to the MLSs. Clear cooperation also harms competition because it preserves safe from competitive threat, the market power that the MLSs have enjoyed for over five decades. This was a once in a lifetime opportunity for competition in a market that had been dominated by the multiple listing services for living memory. And by eliminating the possibility that PLS would obtain a critical mass of listings necessary to compete with the MLSs, clear cooperation harms competition by preserving secure the market power of the MLSs, market power that was otherwise in jeopardy as a result of PLSs entry and expansion. And clear cooperation harms brokers. PLS was competing, as I said, with a bundle of lower prices and more innovative features. Brokers would have benefited from the opportunity to use PLS as services. Conversely, the exclusion of PLS as a result of the clear cooperation policy forces brokers to confront higher prices in a less innovative market for listing network services. Counselor, let me ask you this. You've made the point that this was a once in a lifetime opportunity. So it's something of a novel issue. Given the novel nature of the approach that PLS took, wouldn't that argue more in favor of approaching this as a rule of reason claim as opposed to a per se claim? And if not, why not? Your Honor, we would be fine with rule of reason analysis if that's what the court mandates. There's not a dispute at this stage in the case about whether PLS is adequately alleged a relevant market or adequately alleged market power. So, and we believe we've adequately alleged the absence of a legitimate business justification. Our understanding of the case law is that courts do not typically require the plaintiff to specify the analytic framework for the claim on the pleadings. And so we believe that we've also adequately alleged a per se claim. Okay, so at this point, the issue of whether we view this as a per se claim, a group boycott, if you will, or a rule of reason claim is kind of irrelevant because we need to get back from your perspective to the district court, let the district court move forward with the proper analytical tools in its hands. I believe that's correct, Your Honor. The market power enjoyed by the multiple listing services is an open and notorious fact of American economic life. There are many, many cases arising over decades involving anti-competitive conduct by multiple listing services using their market power to force brokers to refrain from dealing with rivals. This is open and notorious. I don't understand there to be a live dispute that the multiple listing services operate in a relevant market and have market power. Can I ask you a question, Mr. Renner? Okay, one of the questions here in terms of whether or not you've established or alleged antitrust injury in your complaint, I think will have to be resolved on the basis of whether or not the clear cooperation policy injures consumers. I'm not sure from your briefing that you've established precisely exactly how that occurs. Maybe I'm wrong. I know there's issues about the two-sided market and Amex and the government's going to talk about those things, but is the simple fact that the clear cooperation policy, as alleged, knocked PLS.com out of the market significant enough to hurt consumers, or is that not something we should be concerned with? Thank you, Judge Murphy. The relevant consumers for the purpose of analyzing the competitive effects of the clear cooperation policy and the degree to which PLS suffered an antitrust injury are real estate brokers. Real estate brokers are the direct purchasers of listing network services. PLS and the MLSs were competing to offer listing network services to those real estate brokers. And as we've established in our brief, there's virtually a cavalcade of precedent from every circuit to have considered this issue that directs the antitrust, including the Ninth Circuit and the Supreme Court, that directs the antitrust analysis to focus on the effects of the challenge conduct on the direct purchasers in the relevant market. We've clearly alleged that the relevant market is the market for listing network services. That was the market where PLS competed with the MLSs. The direct purchasers are real estate brokers. That's the level of the market where the antitrust analysis needs to focus. And that, we believe, is the single simple dispositive error that the district court committed. The district court error- Before you get too far down your argument, my question's pretty simple. Clearly, knocking PLS.com out of the market, as alleged in your complaint, hurts brokers. And by extension, that hurts certainly sellers of real estate as well, and potentially the buyers on the open market in these various regions where MLS systems exist. Is that, do I have that right? Yes, that's exactly correct, Judge. All right, thank you. I just wanna, following up on Judge Murphy's comment, as you know, the United States, in its amicus brief, actually, it doesn't side with either party, but it agrees with you that the ultimate consumers here are not the buyers and the sellers, but rather the real estate brokers. We had a similar issue in Alston versus NCAA, where they were saying that it was the consuming public and whether they would support people who were not amateurs anymore. And the Supreme Court ultimately agreed with us as well that it was the athletes, not the people who were viewing these amateurs that were the relevant market. So what is your best argument that Amex doesn't change the fact that it is the real estate brokers, not the consumer buyers and sellers that are in effect the relevant market here? Thank you, Your Honor. So we don't think Amex has any traction in this matter at all, certainly not on the pleadings. Amex applies to two-sided networks that are transaction networks that involve simultaneous transactions. We're not a transaction network. And in paragraph 99 of the complaint, we allege this with specificity. And as anyone who's ever listed a piece of residential real estate on the MLS can testify to, these are not simultaneous transactions. The houses can sit for quite some time. So we don't think Amex has any traction here. It's not an antitrust injury case. It doesn't apply at the pleading stage. And we don't think Amex changes the analysis. Does Amex have any... In other words, it's your position that Amex is just irrelevant here. It is our position that Amex is irrelevant. It's also our position that we've satisfied Amex for two reasons. First, and contrary to the position of the appellees, even if Amex applies, what it directs us to do is to allege net harms to participants on both sides of the platform. Appellees have taken the position that harm needs to be shown on both sides. That's an overly restrictive view of Amex. The case clearly says net harm. So we've alleged substantial harm to sellers. We've also alleged harm to buyers. But also, may I point out to the court that Justice Thomas's majority opinion in Amex articulated a second way that the plaintiff can carry whatever burden that that case describes. One way is to show net harm to participants on both sides of the platform. But the second way that Justice Thomas articulated for the plaintiff to carry their burden is to show that competition in the upstream market, the network services market, was stifled. So in Amex, that would have involved proof that the challenge conduct stifled competition between Amex, on the one hand, and Visa and MasterCard and Discover on the other. Here, we easily satisfy this second path because we've alleged that the clear cooperation policy stifles competition in the network services market where people- Just so you know, maybe you see the clock now, but you're less than two minutes. But do you want to save the balance of your time for rebuttal? I would be happy to sit down if that's the- No, no, it's up to you. It's up to you. But if you don't, if you do, then you don't have the rebuttal time. It's up to you. Thank you very much, Your Honor. Okay, now we have a procedural question. The appellees have requested that the United States go second, which is highly unusual. But I would ask the appellate, do you have any objection to the United States making its presentation second as opposed to the appellees? No, Your Honor. Okay, very well. Then we will follow the request of the appellees and request that Mr. Mintz, if you are there, Mr. Mintz, representing the United States. I think you have five minutes. I don't see Mr. Mintz. Is he there? Yes, I am here. Oh, there you are. Okay, there you are. Yes, thank you. Please, Mr. Mintz. Thank you, Your Honor. May it please the court. I'm Steve Mintz for the United States, and we appreciate the opportunity to participate. I have three points that I would like to make that we see as important to antitrust enforcement generally. The first, which Judge Smith, you alluded to a moment ago, is that harm to competition at any market level is sufficient to state a claim. That is clear from the decisions in Alston v. NCAA, including your concurring opinion, and also from the Neville Bar-Derry's case. So the district court's first apparent holding about requiring immediate injury to end-user consumers is error. In addition, anti-competitive effects can take various forms and are not limited to increased prices or decreased output. So to the extent that the district court required PLS to allege increased prices or decreased output as a requirement at the pleading stage, we think that was error as well. My second point regards antitrust injury. Antitrust injury is a gatekeeping doctrine whose purpose is to screen out grievances that have nothing to do with competition. It's not supposed to be a heavy burden on the plaintiff, and it's not supposed to involve balancing or weighing of different competitive effects, pro and anti-competitive effects. The district court here determined, late in its opinion, that PLS had alleged a prima facie case, and that itself includes a finding of a competition-reducing aspect of the defendant's conduct in a relevant market. But once the court has done that, found that there is a prima facie case, all that should remain for purposes of antitrust injury analysis is to tie the plaintiff's injury to that competition-reducing conduct. There was no need to invoke American Express, which had nothing to do with antitrust injury, as Mr. Renner correctly said. I would, okay, my third point is, though, however, because the district court did invoke American Express, I'd like to address it briefly, and explain why the court did so erroneously. The district court wrongly held that PLS had to define a two-sided market as a matter of law at the pleading stage. And that is error because the Supreme Court's decision in American Express gave a very limited holding that a special subset of two-sided platforms or two-sided markets, which it called transaction platforms, require two-sided consideration as a matter of law. That was the court's holding. It focused solely on transaction platforms. Now, putting aside that the district court focused on the wrong market, it focused on something that it called the real estate market, which is the downstream market. Listing services are not transaction platforms. And as Mr. Renner, in our view, correctly pointed out, paragraph 99 of the first amended complaint alleges as a fact, which must be taken as true on a motion to dismiss that listing services like MLSs or like PLS, do not perform any transactions at all and do not perform simultaneous transactions. And the Supreme Court made very clear in its opinion that simultaneity is the key feature of what it called a transaction platform. Now, the district court, following an argument made by NAR, may have thought that facilitating transactions makes something a transaction platform, but that is not the correct standard. Facilitating is far too overbroad to be the applicable standard. As I just said, at page 2280 in the Supreme Court Reporter, the court made very clear that the key feature, the determinative feature of a transaction platform is simultaneity of transaction, simultaneity of use by parties on both sides of the platform. If the standard were to be facilitating a transaction, you could have many things that are not even platforms that could be said to facilitate transactions like newspaper advertising, which is an example the court itself gave. They facilitate transactions, but the court said they do not require two-sided treatment as a matter of law. You could envision legal services which facilitate mergers and acquisitions. Cell phones could be said to facilitate retail sales. You could even say that pieces of paper facilitate many kinds of transactions. It's just a far too overbroad standard. Finally, even if the relevant market is two-sided, which it's not a transaction platform here, but even if it was, American Express, as Mr. Renner said, does not require alleging separate harm to both sides as the district court seemed to require. The district court said that PLS had to allege harm to buyers and sellers, and then it faulted PLS for not making separate allegations of harm to buyers. And that's not required. The Second Circuit in its Amex decision had suggested that an allegation of net harm would be sufficient. And then the Supreme Court in its decision, particularly at page 2286 of the Supreme Court Reporter, gave various ways in which a plaintiff could show harm in a two-sided market. But the Supreme Court never said that net harm would not be sufficient. And by net harm, I mean benefits, harm on one side of the platform outweighing benefits on the other side, as opposed to separate allegations of harm on both sides. So we think- I'm sorry. So we think that the district court made two fundamental errors about American Express, and that really, as Mr. Renner said, it doesn't apply to this case. Particularly, it doesn't apply to this case at the motion-to-dismiss stage that we're at now. Very well. Let me ask my colleagues whether either has questions for Mr. Mintz. Very well. Thank you very much. So, Mr. Hicks, you are next, and you're gonna take the full 15 minutes, I believe. Is that correct? Your Honor, Ethan Glass. Oh, I apologize. I apologize, Mr. Glass. They did tell me it's gonna be you. So we're honored to have you. Please proceed. Thank you, Your Honor. I'm honored to be here. It is my second time, and I hope to do as well as I did the first time. So may it please the court. For the National Association of Realtors, I'm Ethan Glass. I also speak for the other appellees, which are three local multiple listing services. However, if the court has specific questions, they're here prepared to answer any questions that are related. I have one right off the bat, which I'm sure you'll not be surprised at. And that is, as you just heard, the government. You heard what he said. And you also, I'm sure, have read their conclusion that we should hold that PLS didn't need to allege an immediate injury to end users as a reduction in output and increase in prices on two-sided market, or rather, two-sided market, or separate harm on both sides of that market. Why is the government wrong about that? Thank you, Your Honor. With all due respect to my former colleagues at the United States Department of Justice and Interest Division, what they have done is they've ignored the allegations in the complaint. We are here on a motion to dismiss the complaint controls. And so what the Department of Justice, and I can direct the court to the statement of issues presented in the Department of Justice's brief, overstates what the lower court did. The questions presented, the first one is whether a private antitrust plaintiff must always allege immediate harm to end users to allege harm to competition. The lower court did not address that question. The lower court did not- Wait, wait, wait, wait, wait, wait. The lower court clearly, at least in my judgment, said that you needed to allege harm to the ultimate buyers and sellers. Isn't that correct? That's correct, under the complaint. And that's just wrong, isn't it? No, no, Your Honor, because the allegations in the complaint control the relevant customers. So in the Alston case, the complaint identified the relevant customers for whom competition was limited. And that is what the lower court looks at in a motion to dismiss is what are the allegations in the complaint about who is the customer, who is the consumer? It is not an abstract question about do we- Okay, well, let's say you're right, arguendo. Wouldn't that just be we'd send it back so that the plaintiff could amend? No, Your Honor, because the plaintiff, and I can direct Your Honor to all of the places in the first amendment complaint where the plaintiff did this, clearly identified in the first amendment complaint that the consumers of the competition are home buyers and sellers. You need not look at- Where in the complaint are you referring to? Well, Your Honor, we can start with the introductory section. So the third volume of the excerpts of record, pages 549 and 550, are complaint paragraph six and eight, where it alleges the whole point of private listings and PLS is that some sellers do not want publicity. And so whatever the limitation on competition is, the result is that sellers don't get the benefit of wanting to use a particular- But isn't that simply a description of what a pocket listing is? Well, Your Honor, if that were the only place, maybe, but the complaint continues. Oh, and I would also direct Your Honor, in the Department of Justice's brief, page seven, it cites paragraph eight of the first amendment complaint. And I'm gonna quote, the Department of Justice says, the first amendment complaint alleges that the PLS network benefited both home sellers and buyers, not brokers. And then Your Honor, at the hearing before the lower court on the motion to dismiss, this is the first volume, excerpt of record 116, the transcript of the hearing, PLS said to the lower court, I quote, Your Honor, we allege an effect on home buyers and sellers. These are simply examples. In our brief, we have a catalog of all the ways that the allegations, which we all must take as true. I mean, this is an unusual case for me as a lawyer on defense, where I'm insisting that the first amendment complaint facts be taken as true. And the appellant is saying, let's gloss over the facts. Well, let me put it this way. I'm a Chicago law guy. And here we have a situation where, at least according to record, the National Association of Realtors and Affiliates said, we gotta put these guys out of business. It's gonna ruin us. And you did, you put them out of business through a group boycott. Isn't that what happened here? No, Your Honor. No, Your Honor, we did not put them out of business. And we know this by looking at the factual allegations in the first amendment complaint. Everything that PLS alleges in the first amendment- Wait a minute. You're going back to the complaining. And I'm talking about the reality. The reality is there's still- Doesn't the record show that there were meetings, I forget where, I think one in Salt Lake City and one somewhere else, where people said, these folks are creating a problem for us. How can we take care of them? How can we put them out of business? It was very successful. You put them out of business. It was not, Your Honor. The complaint itself shows that, whatever the intent was, and the intent is irrelevant. Whatever the intent was, PLS is still in business. It is still the largest private listing network. It has 20,000 members, according to the complaint, with millions, billions of dollars transacting across its platform. And the complaint identifies the types of things that PLS allegedly offered to the market, a nationwide multiple listing service. That can be offered completely agnostic to the policy at issue here. Well, let me ask you this. You say they have 20,000 members. I didn't see that in the record. I'd be interested in that, but let's assume you're right for a minute. Do all those people have to put that listing simultaneously on the MLS? Well, Your Honor, they don't. If they want to continue in good standing with the NAR. No, Your Honor. The way that the complaint is describing the market is that the PLS network is incredibly successful. It has an incredibly large amount of volume going across it. And the complaint was filed after the clear cooperation policy was effective. And there's nothing in the complaint that says, oh, but those 20,000 now all left us because of the clear cooperation policy. According to the allegations, the facts, legislation, and the complaint, the only thing about PLS's size or volume is that as of the time they filed the complaint, which is after the clear cooperation policy was effective, they had 20,000 members with billions of dollars of transactions. Okay, but that was at the time it became effective. But once it became effective, I thought the allegation was that people left in droves because they didn't want to, you know, they thought, well, look, if I'm gonna be blocked out from the MLS, I can't do that, so I'm gonna leave. No, Your Honor, there is no allegation of that. There is a broad allegation that the listings on PLS decreased, that's it. And I challenge PLS to identify, in the complaint, notice they didn't mention any citations to the complaint of the facts they alleged. But in the complaint, all they say is that their transactions decreased. That is not enough for an antitrust case. And as Your Honor has correctly put his finger on it, the real question, whether you're Chicago school or Harvard school, or you're right down the middle, is whether or not competition has been reduced. A mere shifting of share, which is what PLS's case is about, which is that they had a decrease in listings and that MLS had an increase in listings, is not Harvard competition. Let's take that point. Let's take that point. You're talking about the quantum of reduction. If there's been any reduction, wouldn't that have to be shown later on in trial and determine what actually occurred? No, Your Honor, because as a matter of law, the question that we're asking, we're asking about harm to competition, does not ask what percentage of competition was reduced. Because that's mere share shift. And we know this- Can I interrupt very briefly? I respect all the points you're making. Doesn't the complaint effectively allege a per se boycott, which necessarily reduces competition and gets them as to issue one over the hump, Mr. Glass? Thank you, Judge Murphy. No, respectfully, no. So this court has the Hahn decision, which sets forth the elements of a per se group boycott. And there are many elements as we detail in our briefing that PLS cannot meet. And we dispute PLS' statement during its opening of this hearing that market definition is not contested. It is. In that exact section, market definition and market power are not adequately alleged in the complaint. But putting that aside, Hahn requires, and this is very consistent with the conversation I was just having with Judge Smith, that someone be cut off of supply. It literally uses the words cut off. And that's consistent with the cases in PLS' own brief. If you look at PLS' brief, pages 21 and 22, it cites cases for the proposition that the conduct eliminated a service from the market. Well, but you're taking an all or nothing. The reality is what they've alleged here is that, and you know very well as NAR's lawyer, in the local market, you've got to be part of the MLS. You're out of business. So if you've got people that have clients that want a pocket listing, and the policy requires that if you go with PLS, you've also got a list with MLS, and you may or may not be able to eliminate what some of the clients don't want to say, it clearly is going to reduce it. Why would you list it twice? Why would you possibly list it twice? It's going to reduce it by definition, because people say, well, what do I gain by this? And I understood, I understood that the allegation was there was a reduction. I thought it was a substantial reduction. You say there is no such allegation. We can go back and check that. But like my colleague suggested, I thought they alleged a group boycott that was successful. Right, Your Honor, they don't. They don't, the facts, so the district court did exactly what it should. It looked at the facts alleged, it ignored all the attorney argument and rhetoric, generalized statements about the antitrust law, and asked, did they state a claim? Did they show antitrust injury? Did they show an unreasonable strength to trade? And Your Honor, I'll point the court to the complaint, paragraph 100, which is the third volume of the excerpts of record, page 569, where PLS alleged that 35%, 35% of the real estate transactions in the three MLSs that are defendants here occurred outside of the MLS. So that means that PLS can operate with a significant volume of consumers. And Your Honor, Judge Smith, I respectfully, I do not agree that there's no reason to join PLS if it offers value. For example, if it offers a nationwide service that the local MLSs don't offer, then people would sign up and use it if they saw value in having nationwide advertising. Now, I don't understand why anybody would want that, because I'm not looking for homes in Pasadena, and you're not looking for homes in Washington, D.C., but the complaint alleges it, and I'm taking that as true, that some consumer is agnostic as to whether the home is in Washington, D.C. or Pasadena. But the complaint itself shows that there are significant opportunities for PLS. Let me ask you this. You're a very good lawyer, and I love chatting with you. You're focused on the complaint, but let me just ask you this. In your judgment, does Amex have anything to do with this case, and particularly, does it require that the district court treat the, if you will, the offended party as being the ultimate buyer and seller in the real estate market, as opposed to other real estate brokers? Thank you, Your Honor. I, again, respectfully disagree with my former colleagues at the Department of Justice. This is a quintessential Amex case, and it does require that the court take a holistic view, looking at the allegations in the complaint to determine who is harmed and who is benefited to ensure that the antitrust laws are not reducing pro-competitive conduct or increasing anti-competitive conduct. But also, there was this issue of, if you will, simultaneity. You know, it's an instant transaction, like Amex itself. And as was pointed out, I can't remember if it was the government or attorney for PLS. Anybody who's ever done real estate brokerage knows that these things don't occur simultaneously. It can be months or maybe never. So how does this fit into the Amex framework? Because American Express is not as narrow as the United States, which, by the way, I tried that case in the district court, and the United States lost it on appeal. And they want to narrow the American Express decision as narrowly as possible, as is PLS. And if you read the decision, Your Honor, you will see that the way that Justice Thomas sets up the analysis, it's not about simultaneity or transactions. The question is, are you a two-sided platform? It's question one. There is no dispute here that it's a two-sided platform. In fact, PLS down below argued it was a two-sided platform. So we get past the first question that Justice Thomas asked. The second question Justice Thomas asked is, are you a type of two-sided platform that has these pronounced indirect network effects, which are basically that both sides of the market benefit from an increase on the other side. And that's the distinction he made between newspapers and credit cards. He said, newspapers, you know, readers don't really care how many advertisers there are, but advertisers care a lot about how many readers there are. That does not have pronounced indirect network effects. What a simultaneous transaction does, but what he specifically does not do is say the only type of market that has these pronounced indirect network effects are transaction networks. He does not hold that. And in fact, the Sabre case that the United States directed to says, and that's at 938 Fed 43, the second circuit said that transaction platforms always receive this two-sided treatment. And it was distinguishing from other types of two-sided networks, which you have to ask the question, how much does the other side benefit from an increase on the former side and vice versa? And the complaint here very clearly alleges, as the district court found, that the more buyers you have on an MLS, the more sellers it attracts, and the more sellers you have on the MLS, the more buyers. So it's a quintessential two-sided market under Justice Thomas's decision. Saying that it doesn't have a simultaneous transaction is candidly too narrow of a read of the court's decision, where the court was merely saying, because that was what it had before it, that satisfies the test, but that's not the only type of network that satisfies. Okay, I know you could go on forever, and we appreciate that, but let me just ask my colleagues whether either has additional questions for Mr. Glass. I did actually, thank you, Judge Smith. Mr. Glass, I was curious, you focused a lot on the complaint, which is where I agree the focus should be. What's your response? Because I think they're gonna come up and say, and direct us to paragraphs 102 through 122 of the complaint, which is really the theory of their case. Why don't those paragraphs do the trick? We've pointed a lot to paragraph 100, 101, but 102 through 122 are defendant's unlawful conduct. Well, Your Honor, we have to read the whole complaint together. You can't allege in one part of a complaint that there's harm to competition to X, and then another part of the complaint, harm to competition to Y, and then let the court decide which is the right one. You have to take all of the factual allegations as true. And Your Honor, I'm just going to those particular paragraphs in the record excerpts, just to make sure that I'm with you. Sure, it's ER 569. Okay, thank you, Your Honor. So when the description in paragraphs 102 are talking about the conscious commitment of a common scheme, those are not exclusive of the earlier allegations where clearly PLS has intentionally included multiple listening service members. And I'll tell you why, Judge Owens. As Judge Murphy knows, there is a case called Real Comp. There's a series of cases. In fact, I heard PLS say that there is an open and notorious fact of American life and lots of cases that MLSs are conspiracies and have market power. And what they're doing is in the earlier sections, what they're trying to do is they're trying to say, this case is like those, including Real Comp, which were cases where the courts of appeal found contract combination conspiracy was satisfied by the allegation that the members of the MLS conspired with each other. Here, they needed that because if they only alleged defendants agreed with another to exclude PLS, the defendants don't overlap geographically. We don't compete. So what is missing from 102 is a relevant contract combination of conspiracy because the Los Angeles Multiple Listing Service, CRMLS, and the Washington DC Area Multiple Listing Service, BRITE, two defendants in this action, do not compete. And so they cannot harm competition. They cannot unreasonably restrain trade. The way that PLS bridged that gap is by earlier alleging, it's the members of NAR who are conspiring. They're brokers who compete with each other. And so therefore, there's a contract combination of conspiracy. And so I respectfully, we can't read these allegations out of context. Otherwise we would have brought a different motion. We could have brought a motion that there's no contract combination of conspiracy. But that, you know, I know you're talking about geography, but let's take Beverly Hills, Bel Air. Are you saying that the MLS, and I forget who it is in that part of LA, which MLS it is or which MLS they are, that you're saying they would not be in competition with PLS? No, your honor, that's not what I'm saying. I'm saying that for an agreement to unreasonably restrain trade, you have to make allegations either that they're horizontal competitors so that they're subsidies for each other, or you have to do a vertical agreement, which PLS didn't do because American Express says vertical agreements are almost never any competitive. And so PLS chose the route of going a horizontal agreement. I'm not saying that PLS didn't allegedly compete with the Beverly Hills Multiple Listing Service. That isn't enough though. They need to allege that the Beverly Hills Multiple Listing Service agreed with a competitor to foreclose PLS. Otherwise they wouldn't have satisfied element one of a Sherman Act, which is a contract combination conspiracy. Here, the reason why NAR did not move, I know you know that the multiple listing defendants did move, but the reason that NAR did not move to dismiss based on a failure to allege a contract combination conspiracy is because PLS made the allegation that it's NAR's members, the brokers, who have conspired with each other to limit PLS's entry. And so that is a critical fact that PLS can't have their cake and eat it too. They can't allege that the brokers were part of the conspiracy and the brokers are victims. They can't allege the brokers were part of the conspiracy, but now we're only saying that the multiple listing services are the ones who conspired. And so respectfully, Your Honor, it really matters. Okay, let me ask other questions by my colleagues. This is the kind of case we've talked to a long time, but we thank you very much for that. Mr. Reiner, you have some rebuttal time. Oops, unmute there, Mr. Reiner. All right, is Mr. Reiner there? There we go. Yes, Your Honor, and thank you very much for reminding me to unmute. Yeah. Yep, it's a very 2020, 2021 problem. By the way, because of the time we've taken with your other colleagues, we're gonna give you three minutes instead of just a minute and 33 seconds because we wanna know your responses. So please, go ahead. Thank you, Your Honor. Responding to the argument of appellees with respect to the impact of clear cooperation on the business of PLS, I would direct the court to paragraph 121, which alleges with all the factual specificity required by Twombly that clear cooperation had a substantial adverse impact on PLS's business. I'll also direct you to the finding of the district court on page 17 of the district court's opinion that PLS had plausibly alleged that clear cooperation had caused PLS an injury, in fact. The arguments of the appellees with respect to the 20,000 members of PLS and other indicia of a growing business are plainly when read in the complaint, a description of the status quo ante, what PLS was growing into, but for- Is there anything in the complaint, Mr. Reiner, that describes the current situation of PLS? Your Honor, there's not, other than paragraph 121, which describes the effect, and there are other allegations in the complaint that clear cooperation caused an injury to PLS and extinguished competition in the listing network services market. So the inference of an adverse effect on our business is certainly plausible, and that's what the district court found. Your Honor, part of the issue here is we filed the complaint soon after clear cooperation was implemented, in part because it destroyed PLS's business. If you want to see something in the record that reflects the current state of PLS's business, I'll direct you to ER 48, which is a document introduced by the National Association of Realtors that shows that PLS, after the implementation of clear cooperation, essentially exited this market and pivoted and began offering different services that did not compete directly with those of the MLS. It exited the phantom listing, is that what you're saying? Yes, Your Honor. Before clear cooperation, PLS was competing directly with the MLS. That was the competitive problem that the MLSs and NAR tried to extinguish. With clear cooperation, ER 48 is what you could look to in the record to see what happened next as PLS pivoted its business model to try to find some way to offer value to brokers in a way that did not run afoul of clear cooperation. Ironically, NAR cites ER 48 in its brief, so I'm surprised to hear that they think that we're still a vibrant competitor. With respect to this argument that brokers are the real conspirators here, I recommend that the court take a look at the Fourth Circuit opinion in Robertson. So there are two analytically distinct questions, and Robertson does a beautiful job of this. One is, are the rules of a multiple listing service concerted action within the meaning of section one of the Sherman Act? Yes, and that's black letter law, and Robertson marshals those cases. I recommend that opinion to the court. Then there's an analytically distinct question, which is, are brokers members of the conspiracy? And again, Robertson does a beautiful job of identifying these two analytically distinct inquiries and separating out the fact that MLS rules are concerted action from the analytically distinct question of whether brokers have joined the conspiracy. Okay, all right, you've used your extra time. Do either of my colleagues have additional questions for Mr. Renner? Nope. Very well, we thank all counsel. It's been very, very helpful. You're all very fine lawyers, and it's always a pleasure for the court to deal with excellent lawyers. So the case just argued, PLS versus National Association of Realtors et al. is submitted, and the court stands adjourned for the week. We wish you all a good day. Thank you, Your Honor. Thank you.
judges: SMITH, OWENS, Murphy